UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

**CRIMINAL ACTION NO.: 23-13-S-DLB-CJS**

**UNITED STATES OF AMERICA**                                                   **PLAINTIFF**

**v.**

**DAVID LEE MITCHELL**                                                         **DEFENDANT**

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant, David Lee Mitchell, for his Sentencing Memorandum, states as follows:

1.     INTRODUCTION AND GUIDELINES RANGE

Pursuant to a written plea agreement, Mr. Mitchell pled guilty to a one-count superseding indictment charging him with possessing child pornography. PSR ¶ 4. The maximum term of imprisonment for this offense is 20 years, there is no mandatory minimum sentence. PSR ¶ 78. There is a mandatory minimum term of supervised release of five years with the possibility of up to lifetime supervision upon release. PSR ¶ 82. The sentencing guidelines recommend a sentence between 97 to 121 months based upon a total offense level of 30 and a criminal history category of one. PSR ¶ 79. Mr. Mitchell will request a variance below the guidelines range at the time of Sentencing.

2.     UNRESOLVED OBJECTIONS THAT AFFECT THE GUIDELINES RANGE.

There are no unresolved objections that affect the guidelines range.

3.     SENTENCING FACTORS

The guidelines are advisory in nature. *U.S. v. Booker*, 543 U.S. 220, 259 (2005). While, the guidelines remain "the starting point and initial benchmark in sentencing," a court may determine that a sentence outside of the guidelines framework is warranted based upon the statutory sentencing factors found at 18 U.S.C. § 3553(a) or through a departure within the

guidelines' framework. *Gall v. U.S.*, 552 U.S. 38, 49 (2007); *Rita v. U.S.*, 551 U.S. 338, 344 (2007). In certain cases, both a departure and a variance are justified under the same facts and analysis, but the procedure and substantive law are distinct. *See U.S. v. Tristan-Madrigal*, 601.F.3d 629, 635 (6th Cir. 2010). Even then, the guidelines' application statements provide that the Court shall first determine the guideline range, next it shall consider departure policy statements, then finally consider 18 U.S.C. § 3553(a) factors as a whole. *See* USSG §1B1.1(a)–(c). Having established the advisory guideline range, it is necessary to turn to the potential departure factors first:

 A. The PSR identified two potential departure factors: age and physical condition. PSR ¶ 96.

Mr. Mitchell is a 73 year old Caucasian male who is turning 74 this year. According to the Center for Disease Control, the average Caucasian, non-Hispanic male life expectancy in 2022 is 77.5 years, which was an increase of 0.8 years from 2021 with the decline in COVID-19 mortality rates being the most prevalent factor in the increase. *See* National center for Health Statistics, *Life Expectancy Increases, However Suicides Up in 2022*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Nov. 29, 2023), https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2023/20231129.htm. These are the most recently available numbers based on Counsel's review of CDC press releases and reflect what the CDC calls "provisional" mortality rates. The CDC provided final rates for 2021, which was reflected in the provisional report. *Id.*

In addition to Mr. Mitchell's age, he is in poor health. The PSR reflects Mr. Mitchell's current medications as:

1. Metformin

2. Metropol

3. Aspirin

4. Atorvastitin

5. Cholecalciferol

6. Advair

7. Lisinopril

8. Pregabalin

9. Albuterol

10. Tamsulosin

11. Zolpidem

12. Duloxetine

These medications, are necessary to help with Mr. Mitchell's diagnoses of:

1. Diabetes

2. High blood pressure

3. High cholesterol

4. Rapid heart rate

5. COPD

6. Neuropathy

7. Spinal Stenosis

8. New diagnosis of anxiety and depression because of his incarceration

Mr. Mitchell's health requires constant maintenance and treatment. In addition to the medications and diagnoses listed above, Mr. Mitchell has a history of cancer, prostate issues, and dietary issues related to his diabetes. The PSR more particularly describes Mr. Mitchell's

medical history. *See* PSR ¶¶53-62. The complete picture demonstrates that Mr. Mitchell is medically complex and that incarceration is an *actual* hardship due to medical matters. Mr. Mitchell would respectfully request that the Court recommend a designation to a Federal Medical Center to address his ongoing medical needs if this Court sentences him to a term of incarceration. Having considered departure factors, It is now important to determine the 18 U.S.C. § 3553(a) factors.

      B.    The Nature and Circumstances of the Offense

The nature and circumstances of the offense are described in the PSR. *See* PSR ¶¶7-19. Also relevant is the US Sentencing Commission's report on non-production child pornography crimes as well as the Sentencing Commission's Judiciary Sentencing Information (JSIN) Tool. Turning first to JSIN, based on the information provided by JSIN, "During the last five fiscal years (FY2018-2022), there were 823 defendants whose primary guideline was §2G2.2, with a Final Offense Level of 30 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. Of those defendants, 99% (814 of 823) received a sentence of incarceration in whole or in part. *Judiciary Sentencing Information (JSIN)*, UNITED STATES SENTENCING COMMISSION (Last Accessed Feb. 1, 2024), https://jsin.ussc.gov/analytics/saw.dll?Dashboard. Those defendants' average length of imprisonment imposed was 71 month(s) and their median length of imprisonment imposed was 72 month(s). *Id.* The sentencing data provided does not reflect the Commission's recommendation regarding the appropriate sentence to be imposed or represent the Commission's official position on any issue or case. Nor does the information provided reflect the Commission's position regarding the weight to be given, if any, to the above sentencing information in a court's determination of the appropriate sentence to be imposed. If the court

does consider the above sentencing information as part of its consideration of the factors in 18 U.S.C. § 3553(a) in imposing sentence, it should do so only after considering the properly calculated guideline range and any applicable departures provided for in the Guidelines Manual.

Additionally, the following graphics were provided:



**Note:** The figure includes the 833 defendants reported to the Commission whose primary guideline was §2G2.2, with a Final Offense Level of 30 and a Criminal History Category of I, including defendants who received a §5K1.1 substantial assistance departure. Cases missing information necessary to complete the analysis were excluded from this figure. Defendants who received a §5K1.1 substantial assistance departure are included in this analysis but are excluded from other analyses below. As such, the number of defendants included in this analysis may exceed the number of defendants in other analyses. Total percentages displayed in the figure may not sum to 100% due to rounding.

[remainder of page intentionally left blank]



**Sentence Type for Defendants in Selected Cell (after excluding §5K1.1)**
Fiscal Year 2018-2022
■ Defendants Receiving Imprisonment (In Whole or In Part)   ■ Defendants Receiving Probation or Fine Only

99%

0%   20%   40%   60%   80%   100%

**Note:** The figure includes the 823 defendants reported to the Commission whose primary guideline was §2G2.2, with a Final Offense Level of 30 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. Cases missing information necessary to complete the analysis were excluded from this figure. Total percentages displayed in the figure may not sum to 100% due to rounding.

The *Defendants Receiving Imprisonment* category includes defendants sentenced to a term of imprisonment (in whole or in part) and who received a commitment to the Bureau of Prisons. This category includes (1) defendants sentenced to a term of imprisonment only, with no additional conditions of community confinement, home detention or intermittent confinement (Prison Only) and (2) defendants sentenced to imprisonment and conditions of alternative confinement as defined in USSG §5C1.1 (Prison and Alternatives). This category includes, but is not limited to, Zone A, Zone B, or Zone C cases receiving prison with additional conditions of a term of community confinement, home detention, or intermittent confinement.

The *Defendants Receiving Probation* category includes defendants sentenced to a term of probation with or without a condition of community confinement, intermittent confinement, or home detention (Probation Only and Probation and Alternatives). This category also includes defendants who received no prison, no probation, and no time of alternative confinement as defined in USSG §5C1.1, but instead who received a fine and/or a special assessment (Fine Only).

*Judiciary Sentencing Information (JSIN)*, Supra.

The US Sentencing Commission released a report in 2021 discussing the nature of the offense of possession of child pornography and sentencing. *Federal Sentencing of Child Pornography: Non-Production Offenses*, UNITED STATES SENTENCING COMMISSION (June 29, 2021), https://www.ussc.gov/research/research-reports/federal-sentencing-child-pornography-non-production-offenses. The report made several key findings, which are relevant in this case. *Id.* The primary discussion of the report is enhancements in non-production cases with the most common enhancements applying to possession cases were: Victim age less than 12 (96.3% of cases); Sadistic or masochistic content: (78.6 % of cases); Use of a computer (96.3% of cases); Enhancement due to number of images (95.4% of cases). *Id.* at 19. These enhancements, the Report says, increased the recommended sentencing range to well above the base offense level for the offense in nearly all of the cases due to the ubiquity of technology and technological improvements that were not considered by Congress in the early 2000s. *Id.*

The report found that "significant sentencing disparities among similarly situated offenders as courts and the government contend with the outdated statutory and guideline structure." *Id.* at 69. Next, the 2021 report stated that the 2012 Child Pornography Report influences sentences to this day, they are not helpful as they are sufficiently uniform due to their failure to "jettison" outdated factors. *Id.*

The report further found that judges routinely hand out lower sentences than what the guidelines recommend ranging from probation to 228 months in possession cases. *Id.* at 7, which is also confirmed by the JSIN data provided above.

The Commission also took the time to analyze a commonly held belief about sex offenders: they recidivate at high rates. In this case, they analyzed the recidivism rates of non-production child pornography offenders released from incarceration or placed on probation in 2015. *Id.* pg. 9. Of the 1,093 non-production child pornography offenders sentenced under USSG § 2G2.2, the overall recidivism rate was 27.6% three years after release from incarceration or commencement of probation. *Id.* Of that, 16% were arrested for a crime that was not a sex offense or related to the status of that person as a sex offender, which the study qualifies as "general recidivism." *Id.* at 65.

The sexual recidivism rate for all non-production pornography offenders was <u>4.3%</u> and an additional 7.3% of offenders were arrested or had their term of supervised released revoked for failing to register as a sex offender. *Id.* In its conclusion, the Report unsurprisingly found that USSG § 2G2.2 "fails to distinguish adequately between more and less severe offenders." *Id.* at 19. The Commission also repeated what it said in its 2012 Report: USSC § 2G2.2 "no longer effectively differentiates among offenders in terms of either the seriousness of the offense or culpability of the offender." *Id.* at 69.

  C. History and Characteristics of the Defendant.

    i. General Biographical Information

As previously stated, Mr. Mitchell is a 73 year old Caucasian male of generally poor health. He also has a support system, a family, and has worked most of his life to support himself and his husband, David Eliott. Mr. Mitchell's income is through social security, which is currently subject to suspension and reclaiming of funds paid while he has been incarcerated. Mr. Mitchell is retired, and so is his husband. They live in a paid off home. Mr. Mitchell's social security is the primary income of the household as Mr. Elliott's social security is about 50% less than Mr. Mitchell's. There is an extreme hardship on Mr. Elliott with prolonged incarceration of Mr. Mitchell.

Character letters have been submitted in support of Mr. Mitchell. They are attached for the Court's review and consideration. Mrs. Berman, Mr. Mitchell's sister, describes him as a loving and caring brother and son. Mrs. Berman discusses how Mr. Mitchell put his mother and father's care first, and how he was professionally respected and how his current health concerns are serious. Mr. Elliott, Mr. Mitchell's husband, describes the man who was first his partner and now his husband, and why he supports him and will continue to support Mr. Mitchell. Mr. Elliott describes the hardships he faces as a result of Mr. Mitchell's incarceration and his desire for him to return home.

    ii. Prior Convictions

Mr. Mitchell has no prior criminal convictions.

  D. The Need for the Sentence Imposed.

Pursuant to 18 USC § 3553(a)(2), this Court should consider the following factors: the seriousness of the offense, promoting respect for the law, and to provide just punishment while

affording adequate deterrence to criminal conduct, and protecting the public from further crimes of the defendant, while provided the defendant with needed educational or vocation training or medical care, or other correctional treatment in the most effective manner.

Possessing child pornography is a serious offense. However, as discussed above, the US Sentencing Commission has provided empirical support and recommendations that the current guidelines are not effective. The current guidelines overwhelmingly favors lengthy terms of incarceration as a means to effectuate a "deterrence" system of justice. However, it would be important to look at how other agencies have looked at the question of general deterrence concepts.

The National Institute of Justice in a May 2016 report provides good analysis summarizing a large body of research on deterrence and incarceration. *Five Things About Deterrence*, NATIONAL INSTITUTE OF JUSTICE (May, 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf. It finds that incarceration is not an effective deterrent. Rather, a prison sentence really should be classified as serving the purposes of punishment and incapacitation. *Id.* pg. 2. What it does suggest is that the most important factor for deterrence is the certainty of being caught and the increased perception of being caught. *Id.* pg. 1.

Applying that to Mr. Mitchell, the "deterrent" is in the post-release supervision and the services offered to make sure he is successful in his rehabilitation. The opposite of the desire to deter and rehabilitate offenders is punishment and incapacitation. Punishment and incapacitation are, in fact, retributive forms of justice that reflect societal ideas of what is needed to punish someone for a specific crime – not to help them move beyond that crime.

If applying the § 3553(a)(2) factors while considering Mr. Mitchell's age, health, or other background information, the only certainty is that the longer Mr. Mitchell is incarcerated, the more likely it is that he will simply die in prison without the opportunity to demonstrate his rehabilitation, and that he can be successful on any post-supervision release. If the goal of sentencing Mr. Mitchell is about providing "just" punishment, then Mr. Mitchell would ask this Court to consider all of the issues raised in this memorandum, and give him a downward variance at the time of sentencing.

E.    FINANCIAL MATTERS

Mr. Mitchell's financial obligations as a result of his plea are set out in the PSR. In this case, the primary issues are mandatory restitution, special assessments, and fines. PSR ¶¶86-92. The PSR indicates that the imposition of a fine may adversely affect Mr. Mitchell's ability to pay restitution. PSR ¶77. Mr. Mitchell agrees with that position. The PSR indicates in its assets section that Mr. Mitchell has a total net worth of $490,731.34. PSR ¶75. Accepting this exact number for purposes of this Memorandum, (Mr. Mitchell has provided current statements to probation and parole and the United States that reflect changes due to ordinary expenses and economic changes in retirement accounts), the number itself ignores one critical factor: Mr. Mitchell is a married man, whose assets are rightly owned by himself and his spouse. It would be more correct to state that Mr. Mitchell's total net worth is $245,365.67 and of that, only $140,565.67 would be liquid assets.

Mr. Mitchell and his spouse are also retirees living on fixed incomes. PSR ¶75. Mr. Mitchell's monthly income is currently subject to suspension due to incarceration. PSR ¶75. Mr. Mitchell is not in good health, and, the requirement that Mr. Mitchell register as a sex offender upon release are all factors to consider the assertion that any reduction in his net worth due to

fines, mandatory restitution, or special assessments will have sizeable effect on not only Mr. Mitchell, but his spouse's need to be able to survive and will not be able to be replaced through work upon release.

In this case, there are four requests for restitution. PSR ¶21. That means that the mandatory restitution is at least $12,000. PSR ¶ 91. Mr. Mitchell must also pay a mandatory $100 special assessment. PSR ¶87. As he is a non-indigent defendant, he must also pay a $5,000 special assessment. PSR ¶87. Further, the Court must order an assessment of not more than $17,0000. However, this for this final assessment, the Court must consider the factors set out in 18 U.S.C. § 3572 and 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 2259A. The critical balance here in computing this special assessment is the need to balance the seriousness of the offense (and other factors enumerated in § 3553(a)) with the realities that Mr. Mitchell has limited income, earning capacity, and financial resources (along with the other factors considered in § 3572). As such, Mr. Mitchell will argue at the time of sentencing his position on the up to $17,000 special assessment.

In relation to the mandatory minimum of $3,000 restitution per victim. No complete resolution of this issue has been reached with the victims' counsel at this time. Mr. Mitchell will update the Court if that changes prior to sentencing, but would otherwise be prepared to argue what his position is as to the mandatory restitution amounts are in this manner taking into the account the statutory framework that the "court shall determine the full amount of the victim's losses and shall order restitution in an amount that reflects the defendants relative role in the causal process that underlies the victim's losses, but which is no less than $3,000." *See* 18 U.S.C. § 2259(b)(2).

F.  CONCLUSION

For the foregoing reasons, Mr. Mitchell respectfully requests to be heard on the matters discussed in the foregoing memorandum, and, at the time of his sentencing, will ask the court to consider a downward variance as well as consider his full financial responsibility in this case.

Respectfully submitted,

/s/ Marvin Knorr
Marvin Knorr III
7 West 7th St.
Covington, KY 41011
859.992.6405 Phone
marvin@marvinknorrlaw.com Email
Counsel for Defendant

## CERTIFICATE OF SERVICE

I certify that on February 1, 2024, I electronically filed this document through the CM/ECF system, which will send the notice of electronic filing to all counsel of record.

/s/ Marvin Knorr
Marvin Knorr III

David W. Eliott
3020 Lodge View Ct
Burlington, Ky 41005
January 30, 2024

TO: The Hon. David L. Bunning

United State District Judge

RE: Character Letter for David L. Mitchell

Your honor,

  I, David Elliott, am writing this letter to speak to the Court about my partner/husband of the past 46 years: David L. Mitchell. When David and I first met, what attracted me to David was his sense of responsibility and love for his family. At that time, David's mother was in the final months of her life, taking chemo treatments on his lunch break and spending Sundays with her. After she passed, it was not long until David's father began having issues with his health and self-care where David immediately drove to Cincinnati to help his father transition to moving in with us. I watched David selflessly care for his father, making sure he ate, stayed active, and took his insulin for diabetes. Although David's father only survived for a couple more years during this time, it was David's actions that gave his father dignity in his later months as he was slipping away.

  In his professional life, David was a hard worker who always wanted to be successful and make sure we were taken care of financially. David's work life spanned from his teenage years to when he retired around 2018. His careers were in retail, non-profit, and real estate. While in retail, David's hard work led to him becoming a senior vice president of merchandising responsible for a large and diverse staff. When the retail industry was consolidating, David shifted his career path first into the non-profit sector and finally to real estate. It was during this time that David experienced personal bankruptcy, and while this seems an odd thing to mention in a letter of support, I believe it adds an important element to understanding David's ability to change/adapt and be successful in his goals.

  Bankruptcy led to David, and myself, changing our whole financial life. David committed to no longer having debt, and living a debt-free lifestyle, which we have been successful at. This, I believe, is critical to understanding David as David can be shown where he needs to change, and he can be successful with the help and support of the legal system and his family, and his own self-determination. David's work in real estate gave him a renewed goal of financial stability and I watched as he achieved many milestones while earning the respect of his peers and mentoring newer realtors.

  I would also like this court to know that in our life together, David and I have enjoyed great friends, close family ties, and lots of travel. David has always supported my relationship

with my family. For example, my family did not have a great deal of money, and, knowing this, David would pay for their expenses to travel to visit with us or go on trips, like with my mother and sisters to Hawaii, New York, Washington D.C., and San Francisco. We also frequently returned to Cincinnati for reunions and events as well as return trips to visit the gravesites of my mother, once she passed, and his parents.

When it came time to consider final retirement plans, David selflessly planned our life so I could best continue in the event that he passed away first. I will explain more of that in a moment, but David's selflessness meant trading our single-family home in Dallas for a new, lower maintenance condo and moving back to the Cincinnati area so I would be close to my family, which also meant that David had to leave his sister (who also lived in Dallas), which, to me, was one of the most selfless acts of love I can imagine.

As previously stated, our end-of-life planning has always assumed that David will pass away first. David is not in good health. In the last twenty years, David's health has steadily declined. David has been my life companion and husband and best friend now for 46 years. We built a life together, and I cannot adequately express to the court the emotional toll that these court proceedings have had on David and myself.

Financially, David was always the "breadwinner." His incarceration has meant that we are surviving on only my diminished social security payments (about $1300 a month). The longer he is incarcerated, the more difficult it will be to survive. Our goal is to continue to maintain a dignified lifestyle, and I am committed to being ready for David to return.

What I can say is that I would ask David be given the opportunity to demonstrate that his remorse and shame for his actions are real by living out the remainder of his days with dignity and respect for this court and the laws of the United States. Like his previous Bankruptcy issue, David can and will change what is necessary to solve a problem. I am here to support him then as I will be in the future. I confess, the thought of David dying in prison terrifies me. He is now 73. He is not in good health, and his time in Bourbon County has not been good for his health needs. If this Court does sentence him to prison, I would ask that he sentenced to a facility with proper medical care. Moreover, I would ask that the Court sentence him to a period of time that he can survive. Ideally, I would ask the court to consider probation, as David, upon release, will not be free from the stigma of his crime as I am aware that he will face stringent monitoring and lifestyle changes that are required of sex offenders. Whatever happens, I will be here with him in whatever way I can. My love and support for David will never waiver.

Sincerely,

David Elliott

*David Elliott*

David W. Eliott
3020 Lodge View Ct
Burlington, Ky 41005
January 30, 2024

TO: The Hon. David L. Bunning

United State District Judge

RE: Character Letter for David L. Mitchell

Your honor,

    I, David Elliott, am writing this letter to speak to the Court about my partner/husband of the past 46 years: David L. Mitchell. When David and I first met, what attracted me to David was his sense of responsibility and love for his family. At that time, David's mother was in the final months of her life, taking chemo treatments on his lunch break and spending Sundays with her. After she passed, it was not long until David's father began having issues with his health and self-care where David immediately drove to Cincinnati to help his father transition to moving in with us. I watched David selflessly care for his father, making sure he ate, stayed active, and took his insulin for diabetes. Although David's father only survived for a couple more years during this time, it was David's actions that gave his father dignity in his later months as he was slipping away.

    In his professional life, David was a hard worker who always wanted to be successful and make sure we were taken care of financially. David's work life spanned from his teenage years to when he retired around 2018. His careers were in retail, non-profit, and real estate. While in retail, David's hard work led to him becoming a senior vice president of merchandising responsible for a large and diverse staff. When the retail industry was consolidating, David shifted his career path first into the non-profit sector and finally to real estate. It was during this time that David experienced personal bankruptcy, and while this seems an odd thing to mention in a letter of support, I believe it adds an important element to understanding David's ability to change/adapt and be successful in his goals.

    Bankruptcy led to David, and myself, changing our whole financial life. David committed to no longer having debt, and living a debt-free lifestyle, which we have been successful at. This, I believe, is critical to understanding David as David can be shown where he needs to change, and he can be successful with the help and support of the legal system and his family, and his own self-determination. David's work in real estate gave him a renewed goal of financial stability and I watched as he achieved many milestones while earning the respect of his peers and mentoring newer realtors.

    I would also like this court to know that in our life together, David and I have enjoyed great friends, close family ties, and lots of travel. David has always supported my relationship

with my family. For example, my family did not have a great deal of money, and, knowing this, David would pay for their expenses to travel to visit with us or go on trips, like with my mother and sisters to Hawaii, New York, Washington D.C., and San Francisco. We also frequently returned to Cincinnati for reunions and events as well as return trips to visit the gravesites of my mother, once she passed, and his parents.

When it came time to consider final retirement plans, David selflessly planned our life so I could best continue in the event that he passed away first. I will explain more of that in a moment, but David's selflessness meant trading our single-family home in Dallas for a new, lower maintenance condo and moving back to the Cincinnati area so I would be close to my family, which also meant that David had to leave his sister (who also lived in Dallas), which, to me, was one of the most selfless acts of love I can imagine.

As previously stated, our end-of-life planning has always assumed that David will pass away first. David is not in good health. In the last twenty years, David's health has steadily declined. David has been my life companion and husband and best friend now for 46 years. We built a life together, and I cannot adequately express to the court the emotional toll that these court proceedings have had on David and myself.

Financially, David was always the "breadwinner." His incarceration has meant that we are surviving on only my diminished social security payments (about $1300 a month). The longer he is incarcerated, the more difficult it will be to survive. Our goal is to continue to maintain a dignified lifestyle, and I am committed to being ready for David to return.

What I can say is that I would ask David be given the opportunity to demonstrate that his remorse and shame for his actions are real by living out the remainder of his days with dignity and respect for this court and the laws of the United States. Like his previous Bankruptcy issue, David can and will change what is necessary to solve a problem. I am here to support him then as I will be in the future. I confess, the thought of David dying in prison terrifies me. He is now 73. He is not in good health, and his time in Bourbon County has not been good for his health needs. If this Court does sentence him to prison, I would ask that he sentenced to a facility with proper medical care. Moreover, I would ask that the Court sentence him to a period of time that he can survive. Ideally, I would ask the court to consider probation, as David, upon release, will not be free from the stigma of his crime as I am aware that he will face stringent monitoring and lifestyle changes that are required of sex offenders. Whatever happens, I will be here with him in whatever way I can. My love and support for David will never waiver.

Sincerely,

David Elliott

*David Elliott*

Denise Berman
3900 Ashley Court
Colleyville, TX 76034
214-213-4716

February 1, 2024

To: The Honorable David L. Bunning
   United States District Judge
   U.S. District Court
   35 West 5th Street
   Covington, KY 41011

Ref: Character Reference for David L. Mitchell

Your Honor:

I am David Mitchell's sister, Denise Berman. I am 71 years old. It is with great sadness that I am writing this letter on behalf of my brother David, but I want the court to know that David is a man worth writing this letter.

For all these years, David and I have always been extremely close. We grew up in a loving home with parents that instilled in us to be kind, honest and work hard and love one another. He has always watched out for me. He walked me down the aisle when I got married.

Our parents both passed away when we were in our 20's. Our mother was battling cancer which was difficult to watch. David was always there to help and comfort Mom. Soon after Mom passed away, our Dad was not well. David was living in Syracuse NY for his job. He moved Dad there to live with him and his husband. Dad lived with them until he passed away 2 years after our Mom.

When David turned 16 he started working at a hospital as an orderly in surgery for summers and weekends to make extra money. When he started college, he worked nights plus carried a full schedule of classes during the day to help pay for his tuition.

In his career I saw how dedicated and hardworking he was. David was well respected in his industry in all positions he held. Through the years becoming a vice president for a large company for 30 year before moving on to the non-profit and real estate sectors.

My brother's health is not the best. He suffers from the following: COPD, Diabetes, Elevated PSA levels, Bladder Issues, High Blood Pressure, High Cholesterol, Rapid Heart Beat, Spinal Stenosis (limited standing & walking) Neuropathy and Skin Cancer.

David has helped so many people in his life. His love one's, friends and stranger's all benefitted from the wonderful man he is. I hope you will take in to consideration the good person he is and all the full measure of his life before sentencing him.

Your Honor, thank you for your time.

Sincerely,

*Denise Berman*
Denise Berman (Feb 1, 2024 09:14 CST)

Denise Berman